# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EDWARD T. BROERS,

    Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

    Defendant.

_____/

Case No. 1:16-cv-00202-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I. INTRODUCTION

On February 12, 2016, Plaintiff Edward T. Broers ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

Oberto, United States Magistrate Judge.[2]

## II. BACKGROUND

On December 28, 2012, Plaintiff filed a claim for SSI payments, alleging he became disabled on October 1, 2012, due to "Mental illness and physical inabilities," "Severe Depression," "Anxiety," "Social Anxiety," "PTSD," "Specific Learning Disability," "Obesity," "Coordination deficiency," "Seizures (non-epileptic)," "abnormal growth," and "drug addiction." (Administrative Record ("AR") 12, 17, 163, 178, 182.) Plaintiff was born on June 22, 1991, and was 21 years old on the alleged disability onset date. (AR 25, 163.) Plaintiff has a high school education. (AR 37.)

### A. Relevant Medical Evidence[3]

On December 14, 2012, Plaintiff presented at the Fresno County Urgent Care Wellness Center requesting mental health services. (AR 414.) Plaintiff was "alert and oriented," "calm, coherent, and cooperative," "had good eye contact," "dressed appropriately," his "hygiene was good," and his "thought process was intact." (AR 414.) Plaintiff reported symptoms of "low energy, lack of motivation, sad[ness], hopeless[ness], helpless[ness], over or poor sleep, and feeling all that [sic] time." (AR 414.) Plaintiff also stated that he had been experiencing anxiety." (AR 414.) Plaintiff reported that about six months prior to the visit his depression had gotten worse. (AR 414.) Plaintiff denied auditory and visual hallucinations, but stated that when he used "bad [sic] salt and spice" he experienced hallucinations. (AR 414.) Plaintiff stated that he had a "long history of alcohol and substance abuse, e.g., meth, opium, ecstasy," but that he had stopped using all substances as of October 1, 2012. (AR 414.)

Plaintiff was evaluated by a Fresno County licensed clinical social worker on December 17, 2012, who noted that "the symptoms [Plaintiff] reports are usually associated with drug use [and] the adjustment to not using." (AR 412.) The social worker's assessment notes diagnoses of "[a]djustment disorder with anxiety and depressed mood[,] [rule-out] substance induced mood disorder" and "[p]olysubstance [d]ependence." (AR 412.)

---
[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 6, 8.)
[3] As Plaintiff's assertion of error is limited to the ALJ's consideration of his alleged mental disorders, only evidence relevant to those arguments is set forth below.

2

On January 3, 2013, Juan Carlos Ruvalcaba, M.D. saw Plaintiff during an office visit and completed a mental capacity assessment form. (AR 390, 397–99, 447.) At the visit, Plaintiff was "[n]egative for confusion," was "oriented to time, place, person and situation," and "demonstrate[d] the appropriate mood and affect." (AR 399.) Dr. Ruvalcaba noted that Plaintiff was to "follow up with substance abuse program." (AR 399.) On the mental capacity form, Dr. Ruvalcaba stated that "[b]ecause of recent drug abuse, [Plaintiff] has sustained emotional/mental instability and depression/anxiety/panic attacks." (AR 390, 447.) Plaintiff was noted as "unable to perform in large groups" and having "developed severe social anxiety." (AR 390, 447.) Dr. Plaintiff is "unable to focus, has developed deficit disorder" and has a history of learning disability since childhood. (AR 390, 447.) Dr. Ruvalcaba opined that Plaintiff is "unable to work or perform under stressful situation[s] [due] to emotional/mental instability." (AR 390, 447.)

On April 5, 2013, Plaintiff visited the Fresno County Urgent Care Wellness Center and requested to start services "due to depression, anxiety, and having panic attacks." (AR 416, 444.) Plaintiff reported "increased anxiety, paranoia that others are after or are watching him," "increased depression" for the past six months, feeling worthless and helpless, "having mood swings, [and] lacking energy, motivation or interest." (AR 416, 444.) Plaintiff is noted as having had an "assessment last year but was not optioned for services." (AR 416.) Plaintiff reported he was told that he "needed to be clean and sober for six months in order to be seen for mental health," and had completed a "New Connections" program two days prior. (AR 416.)

Plaintiff attended a group meeting on April 16, 2013, in which he was observed to be "alert and oriented" and "calm and coherent." (AR 421.) Plaintiff "had good eye contact," was "groomed well," his speech was within normal limits, and his "thought process was intact." (AR 421.) Plaintiff participated in the group meeting for the first time, introduced himself, and was "attentively listening [to] other participants' experiences and their pre-crisis plan ideas." (AR 421.) During the meeting, Plaintiff "shared struggles with his depression and anxiety." (AR 421.)

On May 29, 2013, internist Samuel Rush, M.D., performed a complete internal medical evaluation of Plaintiff at the request of the California Department of Social Services. (AR 429–

3

433.) Plaintiff reported that he "has had a problem with drug abuse for several years[,] specifically marijuana and alcohol." (AR 429.) Plaintiff said that "as a consequence of his drug abuse he developed anxiety, panic attacks and depression." At the time of the evaluation, Plaintiff was "stable and untreated." (AR 429.) Dr. Rush noted that Plaintiff had a history of anxiety, panic attacks, and depression, but that Plaintiff presented with a "[n]ormal mental status." (AR 432.)

Clinical psychologist James P. Murphy, Ph.D., performed a psychological evaluation of Plaintiff on July 9, 2013, at the request of the California Department of Social Services. (AR 436–440.) Dr. Murphy observed that Plaintiff's attention was "within normal limits and he was oriented to person, place, time, and purpose for the interview." (AR 437.) Plaintiff's memory "appeared to be intact for short term and remote recall." (AR 437.) Dr. Murphy noted that Plaintiff's eye contact was "appropriate" and his facial expression was "responsive." (AR 437.) Plaintiff's attitude towards Dr. Murphy was "cooperative and friendly" and was "cooperative throughout the tasks asked of him." (AR 437.) Plaintiff described his mood as "sad," but Dr. Murphy opined that Plaintiff's "emotional expression was not congruent to his reported mood." (AR 437.) Plaintiff's "flow of speech was normal for rate, rhythm, tone, and articulation." (AR 437.) Dr. Murphy observed that Plaintiff's "thoughts were clear, coherent, well organized, goal directed, and relevant to the subject at hand." (AR 437.) Plaintiff was "able to handle ideas well, and could identify basic similarities, differences, and absurdities." (AR 437.) Plaintiff "denied that he experienced any auditory, olfactory, gustatory, or tactile hallucinations and none were observed." (AR 437.) Dr. Murphy noted that Plaintiff "did report experiencing some visual hallucinations[,] but his description did not meet DSM-IV-TR criteria for a diagnosis" and he "did not appear to be distracted by internal stimuli." (AR 437.) Plaintiff "did not endorse any delusional material during the interview and his insight, judgment and motivation were appropriate as was supported by his ability to keep the appointment in a timely fashion and his performance on the requested testing tasks." (AR 437.)

Dr. Murphy noted that he "did not observe any abnormal behavior," but that Plaintiff's "memory scale scores were considerably poorer than would normally be expected from an

individual with a Low Average Intelligence Score." (AR 439.) Dr. Murphy opined that Plaintiff has no restrictions concerning daily activities; has no difficulty maintaining social functioning; does not appear to have problems with concentration, persistence, and pace that could jeopardize his ability to work; would not experience episodes of emotional deterioration in work like situations; would not have difficultly understanding, carrying out, and remembering simple instructions; would not have difficulty responding appropriately to co-workers, supervisors, and the public; would not have difficultly responding appropriately to usual work situations; would not have difficulty dealing with changes in routine work settings; and does not have other limitations due to mental impairment. (AR 439.) Dr. Murphy continued:

> It appeared that the most difficult barrier for this individual to overcome if he were to enter the workforce would be his desire not to work and some memory deficits that appeared during the testing. It is recommended that this individual be given the appropriate neurological tests to determine why his memory is failing. This individual is capable of performing Simple Repetitive Tasks (SRT) on a regular basis but not complex tasks.

(AR 439.) Dr. Murphy concluded that Plaintiff "had no difficulty understanding what was asked of him concerning the various tasks during the mental status examination." (AR 440.) Plaintiff "did not demonstrate difficulties understanding the simple instructions of the various tasks, confidentiality, or the reason for the evaluation." (AR 440.) Dr. Murphy noted "no psychological impairment" but that Plaintiff "did endorse psychological problem [sic] as part of his history." (AR 440.) Plaintiff "appeared to understand and follow simple, basic instructions without difficulty." (AR 440.) Dr. Murphy opined that Plaintiff "does not appear to meet the DSM-IV-TR criteria for a mental disorder." (AR 440.)

On July 22, 2013, a Disability Determinations Service psychiatric consultant, Jay S. Flocks, M.D., reviewed the record and analyzed the case. (AR 64–75.) Dr. Flocks noted that Plaintiff presented groomed, alert, and cooperative, Plaintiff's presentation was "normal," and Plaintiff denied auditory or olfactory hallucinations but claimed visual hallucinations that "did not meet diagnostic criteria." (AR 71.) Dr. Flocks found that Plaintiff did not have a severe mental impairment and concluded that the medical evidence "leads to a decision of non-severe polysubstance abuse." (AR 71.)

Plaintiff underwent a "Medication Evaluation" by Patricia A. Santy, M.D., on August 7, 2013. (AR 451–53.) Dr. Santy noted that Plaintiff "continues to have depression, decreased energy" and hallucinations. (AR 451.) Plaintiff's current symptoms included "sad mood, sleeping all the time, [and] lack of interest in his usual activities." (AR 451.) Dr. Santy observed that Plaintiff was "[n]ot feeling paranoid and no delusions were elicited." (AR 451.) Dr. Santy noted that Plaintiff's behavior was "cooperative," his sensorium was "alert," and his cognition was "[n]ormal" and "grossly intact." (AR 452.) Plaintiff's speech was "[n]ormal and "somewhat slowed," and his thought processes were "[o]rganized" and "slowed." (AR 452.) Plaintiff's thought content entailed auditory and visual hallucinations, his mood was described as "[d]epressed, [a]nxious," and his affective range was "[b]lunted." (AR 452.) Dr. Santy diagnosed Plaintiff with mood disorder, ruling out schizoaffective disorder, and polysubstance dependence. (AR 453.) Plaintiff was prescribed Prozac "to target depression" and Abilify "to target psychotic [symptoms.]" (AR 453.)

On August 19, 2013, Dr. Ruvalcaba completed a Fresno County Department of Social Services form where he indicated that Plaintiff had "a physical or mental health condition that prevents or substantially reduces [his] ability to engage in work or training." (AR 555–56.) Dr. Ruvalcaba indicated that Plaintiff was permanently unable to work due to being "depressed and having hallucinations." (AR 555.)

Plaintiff saw Daniel Brooks, M.D., via telepsychiatry for medication management on November 7, 2013. (AR 511–12.) Plaintiff reported a "good response to both Abilify and Prozac." (AR 511.) Dr. Brooks observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 511.) Plaintiff's motor activity, cognition, speech, orientation, mood, and affective range were all indicated as normal. (AR 511.) Dr. Brooks noted Plaintiff was positive for auditory hallucinations, which were improving with Abilify. (AR 511.) Dr. Brooks noted a diagnosis of major depressive disorder, recurrent, severe with psychotic features, but also indicated that his condition was "improving." (AR 511–12.) Dr. Brooks further indicated that Plaintiff had an "[i]mproved" response to medication, and specifically that he was less depressed on medication. (AR 511.)

On July 24, 2014, Dr. Brooks saw Plaintiff via telepsychiatry. (AR 507–08.) Dr. Brooks observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 507.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were all indicated as normal. (AR 507.) Dr. Brooks noted Plaintiff was positive for auditory hallucinations, which were improving with Abilify. (AR 507.) Plaintiff's mood was indicated as normal, depressed, and anxious, with Dr. Brooks noting that Plaintiff is "less depressed on meds but still has 'panic attacks' and will begin Zoloft 50mg." (AR 507.) Dr. Brooks observed that Plaintiff had a "good response to Abilify," and that Plaintiff wishes to discontinue Prozac and begin a trial of Zoloft. (AR 507.) Dr. Brooks noted that Plaintiff's diagnosis of "major depressive disorder, recurrent, severe with psychotic features" was "improving." (AR 508.)

Plaintiff again saw Dr. Brooks via telepsychiatry on September 25, 2014. (AR 505–06.) Dr. Brooks indicated that no side effects from Plaintiff's medications were noted and that Plaintiff had a "[f]avorable response" and his "symptoms [were] improving." (AR 505.) Dr. Brooks observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 505.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were all indicated as normal. (AR 505.) Dr. Brooks noted Plaintiff' auditory hallucinations were improved with Abilify. (AR 505.) Plaintiff's mood was indicated as normal, depressed, and anxious, with Dr. Brooks noting that Plaintiff is "less depressed on meds but still has 'panic attacks'." (AR 505.) Dr. Brooks observed that Plaintiff was "[d]oing well," had a "good response to Abilify," and increased Plaintiff's dosage of Zoloft from 50mg to 100mg. (AR 505-06.)

On December 16, 2014, Plaintiff again saw Dr. Brooks via telepsychiatry. (AR 503–04.) Dr. Brooks indicated that no side effects from Plaintiff's medications were noted and that Plaintiff had a "[f]avorable response" and that his "symptoms [were] improving." (AR 503.) Dr. Brooks observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 503.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were all indicated as normal. (AR 503.) Dr. Brooks noted Plaintiff' auditory

hallucinations were improved with Abilify. (AR 503.) Plaintiff's mood was indicated as normal, depressed, and anxious, and Plaintiff commented "meds doing ok for me." (AR 503.) Dr. Brooks observed that Plaintiff was "[d]oing well" and was having a "good response to Abilify [and] Zoloft." (AR 503–04.)

Plaintiff saw Dr. Brooks via telepsychiatry on February 26, 2015. (AR 501–02.) Dr. Brooks indicated that no side effects from Plaintiff's medications were noted and that Plaintiff had a "[f]avorable response" and that his "symptoms [were] improving." (AR 501.) Dr. Brooks observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 501.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were all indicated as normal. (AR 503.) Dr. Brooks noted Plaintiff' auditory hallucinations were improved with Abilify. (AR 503.) Plaintiff's mood was indicated as normal, with no indication of depression or anxiety, and Plaintiff commented "meds doing ok for me." (AR 501.) Dr. Brooks noted that Plaintiff was "[d]oing well" and was having a "good response to Abilify [and] Zoloft." (AR 501–02.)

On April 2, 2015, Dr. Brooks completed a "Mental Disorder Questionnaire for Evaluation of Ability to Work." (AR 514–15.) He noted Plaintiff had "abnormalities" in concentration that would "impair [his] ability to perform simple work for two hours at a time or for eight hours per day," and indicated that Plaintiff's "mood and affect [are] affected to a degree that it would impair [Plaintiff's] ability to work" due to "depression with anxiety, and psychosis." (AR 514.) Dr. Brooks noted that Plaintiff has hallucinations, delusional or paranoid thoughts, mood swings, and social isolation that would impair his ability to "perform full-time work, week after week." (AR 514.) Dr. Brooks indicated that Plaintiff's social functioning had become deficient to the point that it would "impair [his] ability to work with supervisors, co-workers, or the public," and that Plaintiff's "mental illness [would] impair [his] ability to adapt to stresses common to the normal work environment." (AR 515.)

Plaintiff had another telepsychiatry appointment with Dr. Brooks on May 7, 2015. (AR 544–45.) Again, Dr. Brooks noted no side effects from Plaintiff's medications, and that Plaintiff had a "[f]avorable response" and that his "symptoms [were] improving." (AR 544.) Dr. Brooks

observed that Plaintiff was well groomed, with cooperative behavior, alert sensorium, and organized thought processes. (AR 544.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were all indicated as normal. (AR 544.) Dr. Brooks noted Plaintiff' auditory hallucinations were "greatly improved." (AR 544.) Plaintiff's mood was indicated as normal, with no depression or anxiety noted, and Plaintiff commented that "the same meds renewed would be good." (AR 544.) Dr. Brooks noted that Plaintiff was "[d]oing well," that his depression with psychosis was "improving," and that Plaintiff would continue with his current doses of Zoloft and Abilify. (AR 545.)

On June 26, 2015, Plaintiff's attorney wrote Dr. Brooks, requesting that he "elaborate" on his responses to the "Mental Disorder Questionnaire for Evaluation of Ability to Work" dated April 2, 2015, by completing a questionnaire. (AR 546–49.) Dr. Brooks indicated in response to Plaintiff's attorney's questions that Plaintiff's social functioning, ability to adapt to stress common to a normal work environment, lack of concentration, hallucinations, delusions or paranoid thoughts, mood swings, and social isolation would preclude performance of work for 15% or more of an 8 hour work day. (AR 546–47.)

**B.      Administrative Proceedings**

Plaintiff filed an application for SSI on December 28, 2012, alleging he became disabled on October 1, 2012. (AR 12, 17, 163, 178, 182.) The Social Security Administration denied Plaintiff's application for benefits initially on August 1, 2013, and again on reconsideration on February 6, 2014. (AR 64–95, 101–05.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 110–115.) On July 21, 2015, Plaintiff appeared with counsel and testified before an ALJ. (AR 32–63.)

The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age and education, and with no past work. (AR 59.) The VE was also to assume this person had no exertional limitations but was restricted to simple, routine tasks in a nonpublic setting with minimal social demands. (AR 59.) The VE testified that such a person could perform work as a machine feeder, Dictionary of Operational Titles ("DOT") code 699.686-010, medium exertion level, unskilled, and SVP 2, for which there are 39,000 jobs in the national economy. (AR 59.)

The ALJ also testified that such a person could perform work as a lumber straightener, DOT code 669.687-018, medium exertion level, unskilled, and SVP 2, for which there are 600,000 jobs, and could also perform work as a box bender, DOT code 641.687-010, medium exertion level and unskilled, and SVP 1, for which there are 106,000 jobs in the nation. (AR 60.)

The VE was also asked to consider this same hypothetical person but include the additional limitation that the person would be off task at least 20 percent of the time. (AR 60.) The VE testified that no jobs were available for that person. (AR 60.) Plaintiff's counsel inquired whether the VE's answer would change if that hypothetical person would be off task at least 15 percent of the time, and she responded that it would not. (AR 60–61.)

**C.  The ALJ's Decision**

In a decision dated October 6, 2015, the ALJ found that Plaintiff was not disabled. (AR 12–27.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920. (AR 14–26.) The ALJ decided that Plaintiff has not engaged in substantial gainful activity since December 28, 2012, the alleged onset date (step 1). (AR 14.) The ALJ found that Plaintiff had the severe impairments of (1) obesity, (2) depressive disorder, and (3) anxiety disorder (step 2). (AR 14–15.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3). (AR 15–16.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[4]

> to perform a full range of work at all exertional levels and [Plaintiff] is capable of simple, routine tasks in a non-public setting with minimal social demands.

(AR 16.)

The ALJ determined that Plaintiff had no past relevant work (step 4), but that Plaintiff was not disabled because, given his RFC, he could perform a significant number of other jobs in

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

the local and national economies, specifically machine feeder, lumber straightener, and box bender (step 5). (AR 25–26.) In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 17, 25.)

### III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

### IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous

work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

Plaintiff contends that the ALJ committed the following errors in finding Plaintiff not disabled: (1) failing to properly evaluate the opinions of treating psychiatrist Dr. Brooks, and (2) failing to consider if a closed period of disability was warranted. (Doc. 12 at 5–8.) The Commissioner contends that the ALJ provided specific and legitimate reasons supported by substantial evidence to reject Dr. Brook's opinions.[5] (Doc. 13 at 7.)

//

---

[5] The Commissioner does not address in her motion for summary judgment Plaintiff's argument regarding a closed period of disability. (*See* Doc. 13.)

12

## A. Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons, and those reasons must be supported by substantial evidence in the record. *Id.* at 830–31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). If an ALJ opts to not give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c)(2)(i)–(ii) and (c)(3)–(6) in determining how much weight to give the opinion. These factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency,

specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii), (c)(3)–(6).

**B.     The ALJ Did Not Err in His Assessment of the Opinions of Treating Psychiatrist Dr. Brooks.**

In reviewing the medical evidence and rejecting Dr. Brook's opinions, the ALJ stated:

> I accord very little weight to the opinion of Dr. Brooks. It is unclear whether Dr. Books ever actually examined [Plaintiff] in person, and his treatment notes indicate significant improvement as well as essentially normal mental status findings that are entirely inconsistent with his opinion noted above.

(AR 22.) The ALJ properly rejected Dr. Brooks' opinion that Plaintiff's mental illness impaired his ability to work for 15% or more of an 8-hour work day because this opinion was inconsistent with Dr. Brooks' own treatment notes. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir. 2009) (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (same); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly rejected the opinion of treating physician, where treating physician's opinion was inconsistent with his own examination and notes of claimant); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (a treating physician's opinion is properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (ALJ properly rejected medical opinion where doctor's opinion was contradicted by his own contemporaneous findings); *Teleten v. Colvin*, No. 2:14-CV-2140-EFB, 2016 WL 1267989, at *5–6 (E.D. Cal. Mar. 31, 2016) ("An ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's own treatment notes.") (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Bayliss*, 427 F.3d at 1216); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in

rejecting a physician's opinion.") (citing *Johnson*, 60 F.3d at 1432–33).

As the ALJ noted, Dr. Brooks' treatment notes from November 2013, and July and September 2014, indicate Plaintiff was well-groomed and cooperative, with alert sensorium, and organized thought processes. (AR 21, 505, 507, 511.) Plaintiff had normal motor activity, cognition, speech, orientation, and affective range, and was less depressed on medication. (AR 21, 505, 507, 511.) The ALJ observed that Dr. Brooks' treatment notes from December 2014 and February 2015 indicated Plaintiff had a favorable response to medications with no side effects, that his symptoms were improving, and that he was "[d]oing well." (AR 21, 501–04.)

The ALJ further noted Dr. Brooks' treatment notes from May 2015 (approximately one month after Dr. Brooks opined that Plaintiff's ability to work was significantly impaired by his mental illness) showed Plaintiff' auditory hallucinations were "greatly improved," and his mood was indicated as normal, with no depression or anxiety noted. (AR 21, 544.) Plaintiff's motor activity, cognition, speech, orientation, and affective range were also all indicated as normal. (AR 21, 544.) As observed by the ALJ, Dr. Brooks indicated that Plaintiff was "[d]oing well" and that his depression with psychosis was "improving." (AR 21, 545.)

Such consistently normal or improved findings fail to support Dr. Brooks' opinions that Plaintiff was so significantly impaired by his lack of concentration, hallucinations, delusional or paranoid thoughts, mood swings, social isolation, deficient social functioning, and inability to adapt to stresses common to the normal work environment that he is unable to work for 15% or more of an 8-hour work day. (*See* AR 514–15, 546–47.) Thus, substantial evidence supports the ALJ's finding that Dr. Brooks' treatment notes showed Plaintiff's significant improvement as well as essentially normal mental status findings that are entirely inconsistent with the severe limitations he assessed. This inconsistency was a specific and legitimate reason for the ALJ to discount Dr. Brooks' assessment. *See Bayliss*, 427 F.3d at 1216; *Rollins,* 261 F.3d at 856; *Connett*, 340 F.3d at 875; *Tonapetyan*, 242 F.3d at 1149.[6]

---

[6] In rejecting the opinions of Dr. Brooks, the ALJ also noted that Dr. Brooks "typically 'saw' [Plaintiff] through telepsychiatry" and "[i]t is unclear whether Dr. Brooks ever actually examined [Plaintiff] in person." (AR 21, 22.) Plaintiff contends that the ALJ's criticism that Dr. Brooks never conducted an in-person examination of Plaintiff is "not legitimate" because Dr. Brooks "coordinated treatment, and transmitted both of [sic] his own knowledge and opinion of [Plaintiff] as well as those of the treatment team," citing *Benton ex rel. Benton v. Barnhart*, 331 F.3d

**C. The ALJ Did Not Err By Not Considering Whether Plaintiff Was Entitled to a Closed Period of Disability.**

Plaintiff contends that the ALJ "should have considered whether [Plaintiff] was entitled to a closed period [of disability] from approximately June 2012, the onset of rather severe depression, to November 7, 2013, based on the psychiatric treatment records, which easily meets the 12-month durational requirement." (Doc. 12 at 8.) As an initial matter, it would have been improper for the ALJ to consider a closed period beginning in June 2012, as Plaintiff does not allege he became disabled until October 1, 2012. (*See* AR 12, 17, 163, 178, 182 (alleging October 1, 2012, as disability onset date).) Even if the Court were to consider a closed period of disability beginning October 1, 2012, the alleged onset date, to November 7, 2013, substantial objective medical evidence in the record from this period supports the ALJ's determination that Plaintiff was not disabled within the meaning of the Act for the duration of that period.

To obtain a closed period of disability, the evidence must show that (1) the claimant could not engage in substantial gainful activity for a continuous period of twelve months; (2) the disability ceased by the time of adjudication; and (3) the claimant met all the other eligibility requirements for benefits. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a); *Miller v. Colvin*, No. 1:12–cv–2063–SKO, 2014 WL 3735345, at *11 (E.D. Cal. July 28, 2014). *See also Rosales v. Colvin*, 2013 WL 1410387, at *4 (D. Ariz. Apr. 8, 2013) ("The ALJ is required to consider a closed period of disability if evidence in the record supports a finding that a person is disabled

---

1030, 1035–39 (9th Cir. 2003). (Doc. 12 at 9.) In *Benton*, the question before the Court was whether a psychiatrist who oversaw a treatment team could be considered a treating source when he saw claimant only once. 331 F.3d at 1035–39. Here, however, Dr. Brooks' status as a treating source is not in dispute. Rather, the issue in this case is whether the fact that Dr. Brooks did not examine Plaintiff in person and instead only "saw" Plaintiff via telepsychiatry constitutes a specific and legitimate reason for the ALJ to reject Dr. Brooks' opinions. Plaintiff, who bears the burden of proving error, *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), provides no authority for the proposition that it is error for the ALJ to reject a treating physician's opinions where the physician has conducted his examinations entirely by means of telecommunications technology. However, even if the lack of in-person examination by Dr. Brooks does not constitute a legitimate reason for rejecting, or according "very little weight" to, his opinion, this error is harmless because the ALJ articulated another, permissible reason for rejecting Dr. Brooks' opinions, namely the inconsistency with Dr. Brooks' own treatment notes, *supra*. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal.") (quoting *Batson*, 359 F. 3d at 1197).

for a period of not less than twelve months."); *Reynoso v. Astrue,* No. CV 10–04604–JEM, 2011 WL 2554210 at *3 (C.D. Cal. June 27, 2011); *Johnson v. Astrue,* No. CV07–7263SS, 2008 WL 5103230 at *4 (C.D. Cal. Dec. 2, 2008).

The ALJ noted Plaintiff's attendance at a group meeting in April 2013, where he was observed to be "alert and oriented" and "calm and coherent." (AR 21, 421.) Plaintiff "had good eye contact," was "groomed well," his speech was within normal limits, and his "thought process was intact." (AR 21, 421.) Plaintiff participated in the group meeting for the first time, introduced himself, and was "attentively listening [to] other participants' experiences and their pre-crisis plan ideas." (AR 21, 421.) As the ALJ observed, Dr. Rush noted Plaintiff presented with a "[n]ormal mental status" during his examination on May 29, 2013. (AR 19, 432.)

The ALJ also reviewed the psychological evaluation of Plaintiff performed by Dr. Murphy on July 9, 2013, to which the ALJ assigned "significant weight" – a decision Plaintiff does not contest. (AR 22–23, 436–40). Dr. Murphy observed "no psychological impairment" and opined that Plaintiff "does not appear to meet the DSM-IV-TR criteria for a mental disorder." (AR 22–23, 440.) As noted by the ALJ, Dr. Murphy concluded that Plaintiff is capable of performing simple repetitive tasks on a regular basis but not complex tasks, with no other restrictions. (AR 23, 440.)

Finally, the ALJ reviewed the notes from the "Medication Evaluation" performed by Dr. Santy on August 7, 2013, in which Dr. Santy observed Plaintiff was "cooperative," his sensorium was "alert," and his cognition was "[n]ormal" and "grossly intact." (AR 21, 452.) Plaintiff was noted as "[n]ot feeling paranoid and no delusions were elicited, and was prescribed Prozac "to target depression" and Abilify "to psychotic [symptoms.]" (AR 21, 451, 453.)

This evidence fails to demonstrate that Plaintiff had disabling limitations as a result of his mental impairments from October 1, 2012 to November 3, 2013. Contrary to Plaintiff's assertion that "the ALJ did not consider the treatment records prior to November 1, 2013" (Doc. 12 at 8), the ALJ carefully and fully addressed this evidence in his decision (*see* AR 21–23), and reached a reasonable determination that it did not warrant a finding that Plaintiff was disabled. Because the ALJ's evaluation of the evidence and findings that Plaintiff did not suffer an impairment for a

| | |
|---|---|
| 1 | continuous period of twelve months is supported by substantial evidence, it was not error for the |
| 2 | ALJ not to consider Plaintiff's eligibility for a closed period of disability.  *See Felton v. Colvin*, |
| 3 | No. 2:15-CV-2315-CKD, 2016 WL 6803680, at *4–6 (E.D. Cal. Nov. 17, 2016)*; Miller*, 2014 |
| 4 | WL 3735345, at *11.  *See also Rosales*, 2013 WL 1410387, at *4–5; *Laib v. Astrue*, No. CV–09– |
| 5 | 0142–CI, 2010 WL 2218294, at *3–5 (E.D. Wash. May 26, 2010); *Jolliff v. Barnhart*, No. C 02– |
| 6 | 03855 WHA, 2003 WL 21715327, at *2–3 (N.D. Cal. July 16, 2003). |

### VI.    CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:     **April 20, 2017**                              /s/ *Sheila K. Oberto*
                                                                    UNITED STATES MAGISTRATE JUDGE